Thank you, and may it please the Court, Your Honors, I'm Clay Snell here for RG LLC. What I hope is obvious to this Court is that this entire case really turns on Ryan DeLazio's mental state. That is, what did he know and when did he know it? Of course, we disagree that there was ever any restriction on the right for Segundo Sueños to transfer any of its assets, but if there was, the entire case would turn on whether Ryan DeLazio was aware of those restrictions, and more importantly, or equally as importantly, is when was he aware of those? As this Court- He didn't need to be because his daddy was running the show in the background. Well, Your Honor, that's obviously a heavily, heavily disputed point. Well, it's not disputed that the mail all went to wherever the dad was, and the accountant was associated with the father, and there were several indicia, I may have not remembered them all now. Well, nobody's denying that Ryan's father, Raul, did assist Ryan in this. I mean, they worked together, it's a father and son, and so the evidence in the record shows that Mr. Raul DeLazio assisted Ryan in this particular case, but there was no evidence that he assisted him in obtaining that asset. There was no evidence whatsoever, and that's a good point, Your Honor, because that's an inference that might be drawn, arguably, that Raul had a hand in this, but an inference that also might be drawn is that he didn't, and that really doesn't mean anything, and that underscores the point I would like to make. All of these questions of mental state are inherently questions of fact, and as this Court has held on many occasions, are not appropriate for disposition on summary judgment. So all we're asking for here is that before RTG gets stripped of its rights, rights that Ryan worked diligently to acquire, that he paid good money for, that we at least be given our day in court so we can explain our side of the story, and then let the jury decide whatever inferences it wants to draw from that evidence, including . . . I mean, whatever happened to Mr. Jackson, just for my interest? Well, obviously, RTG got the judgment against Mr. Jackson, and he was . . . Well, he vanished. I mean, where is he today? We don't know. The district court in this case ordered before the parties or before Ms. Katona could withdraw monies, she was to attempt to give notice from him, and so the parties have sent notice to the only address that a private investigator recently determined was a valid address, and so we don't know where Mr. Jackson is. I mean, he's been given notice of it, and just for whatever reason, he's chosen not to respond to these . . . to this lawsuit. So tell us why this isn't all precluded by collateral estoppel. The reason it's not precluded by collateral estoppel is collateral estoppel requires there to be, among other things, a determination, and so there has never been a determination that Ms. Katona was awarded the rights, the non-music rights, of Segundo Sueños. If you look at the 2015 judgment that Judge Hudspeth signed in the Segundo litigation at the fourth paragraph on the first page, he talks about where he wants to award ownership of something. And he does so very clearly, and he says, all royalty and other rights to the music of the Ohio Players, previously owned by Artist Rights Foundation or Segundo, shall be owned. And so if he wanted to make a determination that Ms. Gloss owned the Jackson claim, he would have said so in there. Instead, the reference to turning over, or the reference to other assets, is in the language that deals with turnover. And so there's no reason that Judge Hudspeth would have used the phrase turnover if he really meant that she was awarded an interest in. As further proof to that point, Your Honor, that there was never a determination that Ms. Katona owned Segundo Sueños' non-music rights assets, is look at the bankruptcy court's conclusions of findings of fact and conclusions of law. And remember, the district court in the Segundo litigation in 2015 didn't try the case. It just adopted the bankruptcy court's findings of fact and conclusions of law. And the bankruptcy judge goes through great detail, I think spends 25 or 30 pages explaining why Ms. Katona wins on her claims, and what she wins, and goes into great detail. But nowhere in those 25 to 30 pages of bankruptcy court findings of fact and conclusions of law did the bankruptcy court ever say that non-music assets go to Ms. Katona. And so if there was ever a determination of that, it would have been either in the bankruptcy court's findings of fact and conclusions of law, or Judge Hudspeth's memorandum opinion that accompanied his 2015 judgment. Another requirement of collateral estoppel is that it has to claim, to show that a claim has been actually litigated, is it has to have been raised in the pleadings. And I would direct the court to Ms. Katona's fourth amended complaint, the live complaint she had when the Segundo case went to trial in 2010. And that set the record, by the way, at 1743, and in particular I would look at page 1749. And in there, she lays out what she's asking for when a case goes for trial, and she doesn't request exclusive ownership of Segundo's non-music rights assets. She only says that she wants to be given her share of assets, not the whole thing, of only those assets that previously belonged to Artist Rights Foundation. And so the Jackson claim never, nobody's suggesting that the Jackson claim ever belonged to Artist Rights Foundation. In fact, it only arose much later in litigation when this court overturned the judgment that Mr. Jackson had collected on. And remember the entire... But there was an injunction pending throughout that time that said Segundo Sueno's may not transfer any claims. Well, at best, I think there was a preliminary injunction pending. Well, that goes through the existence of the judgments for sure. Well, we dispute, let's assume that that is true, Justice Jones. And that may be. And if, in fact, that asset was transferred in violation of a temporary injunction, collateral estoppel doesn't apply, because a temporary injunction is not a final determination. Well, if they violated it, they violated it. Well, if they violated it, then there's a remedy for that, and it's the legal claim of civil contempt. And civil contempt provides a remedy, it provides damages if Ms. Katona was damaged by the transfer. Civil contempt affords... You're not... Nobody's making the argument that this is remediable only in damages, right? What they're talking about is the right of Jackson that was foreclosed on, arguably illicitly, by RTG. Well, nobody's arguing that there was anything improper. I mean, he was served at the same address that the courts... Well, no. I mean, assuming that is correct, and Mr. Jackson hasn't come forward to contradict it, the point is, if RTG got it illicitly, and she has the right to a remedy for that illicit transfer of the claim, then that could go in transfer of the property right that was foreclosed on, or in damages, and nobody suggested a damage remedy here. Well, we're suggesting that her remedy is damages, and remember, you have to go back and look at... What's your best law for that? Well, it's the cases we've cited from this court about what the remedy of the claim of civil contempt is to restore a party to where they would have been had the transfer not occurred. And had the transfer not occurred, arguably, all that meant was there would have been an asset that she could have seized and sold and applied toward the outstanding judgment. So if she is... The way she is made whole is she's either given the value of the asset that was transferred in violation of an injunction, or she's given damages in an amount that's necessary to satisfy her judgment in the Segundo case. There's no law that says that she just gets to keep the asset if it was transferred in violation. And what would happen... If we were to agree with you, what would happen to the Jackson interest? What would happen, if you agree with us, is that, and this is what we asked the district court to do at the very end, was if you're going to do that, at most, let Ms. Katona hold the Jackson interest. Every month or every quarter, monies are coming in until that Segundo judgment is satisfied. It's already... Many hundreds of thousands of dollars have already been paid on that judgment. She can hold it until her judgment is satisfied, and once the judgment is satisfied, she's made whole. She's gotten the 25% interest that was transferred from ARF to Segundo back. She's gotten the money damages for the monies that Segundo collected from the Ohio players. And you guys, your clients, who walked away and brazenly defrauded her, then get the residual. Well, when you say your clients . . . I mean Raul and his daddy. Well, Raul and his father are not parting students. It's Ryan Galoz who's here . . . I understand that, but the district court found, not without reason, that RTG was just a . . . I don't recall whether the court exactly said alter ego, but it was definitely an agent of Raul and his daddy. Well, no, Your Honor. That was in reference to Segundo Sueños in the prior litigation. The bankruptcy court found that Segundo, or was it, or Alfred was a straw man for Raul or Segundo. Yeah, but RTG was deliberately set up in order to receive the Jackson claim from Segundo, right? Well, it was set up by Ryan to pursue a business opportunity, and these are . . . And how much did he pay Segundo for that business opportunity? Well, he paid $5,000 for an unrealized claim. Yeah, yeah, which he then foreclosed on for about $500, right? Well, he paid the full amount of the judgment when other people were bidding at the auction, but understand . . . I understand that, and that was a few hundred dollars, right? No, he bid the full . . . I can't remember the amount that he bid. I thought he bid the full amount of the . . . I don't think he was out of pocket, put it that way. That's correct. He was never out of pocket, and according to you, that interest is worth a lot of money even after hundreds of thousands get paid to Ms. Katona, right? Well, nobody's denying that it's a valuable interest, certainly. So that's why I'm saying there's something smelly about what's going on. Well, again, those are inferences that could be drawn. We would like to present our side of the story, that Ryan couldn't possibly have had knowledge. He was a child, and remember the Segundo litigation spanned a better part of a decade. He was getting an MBA, wasn't he? Much later, long after the Segundo litigation. So when . . . how old was he when he formed RTG? Oh, he was in his 20s at that point. And he had gotten his MBA. Not an MBA. He'd had a degree from Duke, but to look at the . . . Poor guy. To look at the Segundo record, the docket sheet comprises 850 entries. I've been in this appeal for two years, this case for two years, and I still have to go back and look and . . . You're lucky. It could have been 10 or 12 years. The point of this is, is if there was a transfer in violation of an injunction, there's a remedy. At the time Ryan spent $5,000 on this claim, recall that the appeal of the Segundo litigation was still pending, and Raul and Segundo were asking that Jackson's claim be reversed and that Jackson be divested of his interest. So at the point . . . at the time Ryan bought the claim for $5,000, it was highly speculative. They didn't have any knowledge of whether Mr. Jackson still had his interest, had he pledged it to somebody else, and so . . . I mean, it's turned out great for everybody, and everybody has benefited from it. And so . . . That's why I say, I'll bet you Jackson is going to surface someday. And that very . . . that may be, and we'll deal with that when it does. But the point is, this is a summary judgment. This is called the salami tactic. First you deal with the wife, and then you deal with the guy who actually owned the interest to begin with. Well, Your Honor, we would like our day in court. We think when we get to . . . before RTD is stripped of its asset, it ought to be given an opportunity to go in court and explore its side of the story, and let the jury draw whatever inferences. If the jury thinks that Raul's . . . I don't . . . there's no real evidence that other than assisting his son on a few matters, Raul had really anything to do with it. Even though his post office box was the depository, I'm getting a little . . . I read the briefs a while ago, but there were definite connections to his office for . . . And nobody's denying. . . . for RTD. Well, then how can he be a minor player? Well, again, these are all inferences. We're at the summary judgment stage. It's undisputed, though, right? So the kid's at Duke, and Daddy's in Florida or whatever, and Daddy gets all the documents. What the evidence you're referring to is that the home address at which RTD was registered happened to be an address that . . . I think that's what the evidence was, no more than that. But again, at the summary judgment stage, the inferences are to be drawn in favor of the non-movement, not against. These are all inferences being drawn against the non-movement. We're just asking for our day in court. The collateral estoppel doesn't apply. If there was a violation of an injunction, there's a remedy. It's a claim for civil contempt, and the district court can't use the Declaratory Judgment Act to undo that law of civil contempt because, recall that on a claim for civil contempt . . . Tell me again what you say a civil contempt is designed to do. Did you say a civil contempt is designed to make the person whole again? Is that what you said earlier? So if there was a violation of an injunction, at worst, it deprived Ms. Katona of an asset that could have been sold or auctioned, like other assets were, to satisfy her judgment in the Segundo case. So those would be the damages, either the value of the asset . . . And the civil contempt is the appropriate vehicle for recovery of those damages. That's correct. And that's what this court has held, and we've cited that case . . . I just wanted to be . . . you can go ahead. I just wanted to be sure I was clear on it. All right. I'm out of time. Unless the panel has any more questions, I'll save the rest for a follow-up. No, sir. Thank you. Okay. Mr. Lee. Good morning, Your Honors. May it please the Court royally for Lisa Katona. I want to begin by taking you through the judgment in this case. The judgment in this case . . . I'm sorry, in the Segundo case . . . in the Segundo case said three things for Ms. Katona. It said she recovered money damages from Segundo and Raul Galarza . . . point one. Point two, it declared and awarded her distinct 25% ownership interest in the music rights. And three, and separately . . . and you can find it begins on the second page of the judgment and continues on to the third . . . the judgment says, all claims and causes of action, all were to go to Lisa Katona. Three separate things. This is the 2015 on-remand . . . I'm sorry, Your Honor, didn't you . . . Which . . . do you have a record site for that or is that . . . It is the November 2015 judgment, the judgment this Court affirmed in its 850 Fed Third Opinion in 2017. Okay. Right. Whether the judgment was correct or not in what it said about turning over litigation rights to Ms. Katona is not for debate now. Segundo appealed that judgment. We came to this Court. The Court affirmed that judgment. But in that appeal, Segundo did not complain about that aspect of the judgment. Segundo complained about the award of money damages, the actual damages. Segundo complained about the award of exemplary damages. There is not a word in the Segundo Raul Al brief in this Court with any complaint about that third aspect of the Segundo judgment. This case, RTG v. Katona, is all about that judgment, what it means, what its effect is. Now, they had already transferred the Segundo . . . the Jackson claim before November of 2015 or right after November of 2015. In other words, when was RTG formed to receive the Jackson claim? RTG wasn't formed, Your Honor, I believe until . . . Sixteen. . . . 2016. So they knew darn well about what the judgment provided, although it was on appeal. Absolutely. And, Judge, there were a series of judgments in the Segundo litigation that were appealed from the bank . . . This started in 2010, and remember back in those days, we had the whole bankruptcy argument about the authority of the bankruptcy judge to sign judgments. There was a 2010 bankruptcy court judgment. You don't need to go through all that. Just to tell you this, Judge, the earliest judgment, the 2010 judgment from the bankruptcy court, the 2012 judgment from the district court, all, just like the 2015 judgment, had this order in them against Segundo to turn over its rights and claims initially both to Ms. Katona and Jackson, while Jackson was still a party in the Segundo case, but to Ms. Katona. That part of the Segundo litigation goes back to the earliest of the judgments in 2010, and it actually goes back two years earlier to the 2008, the May 2008 preliminary injunction. So in my mind, respectfully, Your Honors, this case is all about that 2015 judgment, and juries don't decide what federal court judgments mean. That's not a question of law. You know, in Texas law, if a contract is ambiguous, if a court makes the legal determination that the contract is susceptible to two or more interpretations, then a jury decides the better interpretation. Fine, with a contract between two parties, but that's not how it works in federal court with a federal court judgment. If a federal court judgment is ambiguous, the court determines its meaning and effect. There's nothing for a jury to decide here. Mr. Snell began with the idea that this case is all about Ryan Goloz's mental state. I respectfully disagree. The assignee in an assignment takes whatever is assigned subject to the baggage of his assignor. This court said that, interestingly, in one of the many opinions, one of the times we've been here, Goloz versus Katona. That was similarly a cause of action got assigned to Al Goloz, and Al Goloz sued Ms. Katona, and the court said Al Goloz is subject to the same baggage that his assignor had. He can't assert the cause of action, and so it is here. Ryan received the right to sue Jackson subject to his assignor, Alan Segundo, and they were subject to the judgment. Let me ask you this as an experiment. Suppose I'm looking at the 2015 judgment, and it says Defendants Goloz and Segundo Sueños are ordered not to dissipate any assets of Segundo Sueños. In addition, they are ordered within ten days to turn over all such assets to Lisa Goloz. So, suppose they had done that, and then it said, we're ordering Raul and Segundo and anyone acting in concert with them with knowledge of this injunction not to dismiss, compromise, settle, or assign any of the rights claimed, blah, blah, blah. Okay, suppose they had complied with that and turned over the Jackson, at that point the Jackson claim matured, correct? The Jackson claim. By that point, yes, Your Honor. Yeah. So, suppose they had turned that over to Lisa, and Lisa had foreclosed. Who would get the remedy from Lisa foreclosing on the Jackson claim to obtain the Jackson interest? Lisa, Your Honor, because the judgment doesn't say otherwise. Perhaps it should have. Perhaps the Segundo judgment should have said, this is a Chapter 31 turnover order, and if I have to . . . Well, normally you don't turn over, you know, normally you turn over to a trustee. Normally, quote, turnovers in bankruptcy do not go to a judgment creditor. Right. Correct. Right. So, I'm not . . . it's not . . . the language of turnover confuses me somewhat here, and I'm just theoretically wondering whether she had . . . whether it was . . . I guess nobody foresaw at this time that maybe Jackson wasn't going to come forward and contest when the claim was . . . you know, when the claim suddenly matured after this period of litigation. Judge, I can give you my speculation, and it'll just be speculation. I think by that point, Judge King in the bankruptcy court and Judge Hudspeth knew that more than words in a judgment would be required. It would require action from Raul Galaz and Al Galaz and Segundo Sueños. It would take the kinetic motion of the delivery of the claim papers, the evidence. I suppose the alternative is to say that, you know, turnover presupposed ownership because otherwise the judgment would have said, and by the way, if she gets anything from any of these claims, she has to share it back. Exactly. If that had been what Judge King, as the initial author . . . I'm looking at the Hudspeth judgment. Judge Hudspeth adopted Judge King's findings, or proposed findings, recommended findings, and conclusions. And if that's what they had in mind, they would have said it, but they didn't. And if you think about it, Judge, by that point, remember artist rights started off with three, Raul, Lisa, and Julian, and for a period of time in the adversary proceeding, they were all litigants. But then Jackson dropped out. It was no longer . . . he was dismissed. So I think, and I concede this is speculation, but play it through. If Judge Hudspeth had said, distribute what you get, there was no effective way at that point to ensure that anything went to Jackson because Jackson was no longer in the case. It was no longer subject to the court's jurisdiction. At that point, it was simply between Ms. Katona and the fraudsters, and I think Judge Hudspeth and Judge King decided, well, as between those two, any litigation rights or claims are going to go to Lisa. Where is Jackson today? Your Honor, at the conclusion of this case, when Judge Pulliam signed the judgment, he said that he included protective measures for Mr. Jackson before the judgment would become hard and enforceable. He required Ms. Katona, really me, to deliver a copy of the judgment to Mr. Jackson. And with a process server and a private investigator, I found a UPS, essentially post office box, in Los Angeles that Mr. Jackson had used for years, was still using actively, and was using himself as a litigation address for California litigation in which he was the plaintiff. So we had the judgment delivered to that UPS box. I think this declaration is in the record in this case. If not, it's in the record in the Western District. The delivery person, the process server, affirmed that I, the affiant process server, have also delivered litigation papers to this Mr. Jackson at this same UPS box recently. And so, I can't tell you where he lives, I don't have a business, I don't have a brick and mortar address. I mean, it just seems sort of unfortunate since he was the creative artist in regard to these materials. It does, Judge. He did get notice, I can tell you, for years during the related BMI adversary proceedings. There's sort of a footnote in this case about distributions to Ms. Katona from the bankruptcy court in that related BMI adversary. I have served motions on Mr. Jackson for years, notifying him of Ms. Katona's request for distributions out of the funds that are in the registry of the bankruptcy court. And the clerk of the bankruptcy court has served on Mr. Jackson for years, hearing notices for the hearings on those motions. At that same UPS address. That's all I can tell you, but I can tell you the effort has been made to try to notify Mr. Jackson of the proceedings. A couple of points, Your Honor. You asked about how much Ryan paid. Ryan did satisfy. Ryan didn't satisfy. He didn't come out of his pocket with dollars to buy. He credit bid judgment dollars at the foreclosure. Could he, could the foreclosure under California law have covered all assets of Jackson? It didn't have to be limited to the Jackson interest, did it? We've spoken about it this morning as a foreclosure. It was actually what I think in Texas, at least, I would call an execution sale. And because it was an execution sale, my personal instinct is that it probably did need to identify the assets on which there was the execution. Okay. Your Honor, that concludes my remarks. If you have questions about record material, I'm happy to do my best to answer them, but that concludes my remarks. Well, what do you do with the fact that the court didn't expressly talk about its judgment as based in contempt? In other words, the court really was talking about collateral estoppel, right? Judge, I think the court was more practical. Raul and Segundo and Al were not parties in this case. Frankly, Judge, what's the point? Suing Raul Galaz and Segundo and Al Galaz is like wrestling with a pig. I just get dirty and they have fun with it. The point was to recover the asset that had been stolen, or at least the fruit of that asset, and to do that, all we needed was RTG, and so we sued RTG. The efficient remedy was recovery of the asset, and that's what we did. Judge Pulliam accomplished that at the end of the case by saying, I conclude Ms. Katona is the owner. I conclude she's the owner, but RTG, now's your chance. Come back and tell me she isn't, and they didn't. On that basis, Judge Pulliam, I think, correctly granted a declaratory judgment determining her ownership, and awarded as restitution the money that RTG had, I think, illicitly received on the rights during the period of the litigation. One more point, if I may. RTG does argue . . . I listened to that answer, so you're saying it just doesn't matter whether it was collateral, estoppel, or civil contempt? I'm saying . . . I think of civil contempt as being against the contemnor. In this case, that would be Segundo or Al. I think of this case as being against their assignee, so I don't think it matters, Your Honor, and I think the more efficient remedy was to get there through a determination of the ownership, which is what Judge Pulliam did. RTG says that a litigant can't use the declaratory judgment to get a determination of ownership unless there is a standalone, independent cause of action, and I say that's wrong. Nothing in 28 U.S.C. 2201 requires that. The Declaratory Judgment Act, Section 2201, does require that there be an independent basis for federal court jurisdiction and that there be a case and controversy within that jurisdiction. That's satisfied here. RTG is the plaintiff here. RTG never said there's no jurisdiction in this case. We are properly before the court through diversity jurisdiction. RTG is a Massachusetts LLC, and Ms. Katona lives in Texas, and there's more than $75,000 in dispute. This court and courts all the time routinely use the Declaratory Judgment Act to declare and adjudicate disputes when there isn't a cause of action. For example, in Rowan Companies v. Griffin, this court affirmed the declaration that an employer didn't owe money to the employee. The employee was a worker on an offshore oil rig. The employer wanted to know that the employer did not owe maintenance and cure. No one sued anyone on a traditional cause of action. Courts do that all the time. Well, this is for enforcement of a judgment, right? This was for the enforcement of a judgment through the application of preclusion. Yes, Judge. May I stand down? I guess so. Thank you. Mr. Snell. Yes, Justice Jones. The question that you raised with regard to the language on the second page of Judge Hudspeth's 2015 judgment, where it talks about the turnover requirement, and the defendants in that case were ordered to turn over assets and evidence of their ownership to Ms. Gloss. The last clause, though, is what's most important, and it says, as co-owner of the royalties and other assets. And so if that was intended to award ownership, there would have been no reason to identify her as a co-owner. And so if that language was truly intended to be an adjudication of ownership, there would be no need to write as co-owner of the royalties. In fact, recognizing her as a co-owner only validates what we're saying. Well, the co-ownership went to the race, the actual, the 50-25-25. And here we're talking about foreclosure on the Jackson claim, which yielded Jackson's 50% interest, right? Well, it resulted in RTG acquiring the 50% interest. That's what I'm saying. Right. So this, to me, this would fall under that language and other assets, as co-owner of the royalties and other assets. Well, but in terms of that, that's not an adjudication that she was an owner of those assets. At best, it was an instruction that they turn it over. Well, but you didn't, but what you're asking for is approval of ownership of the Jackson interest, right? That's what your declaratory judgment was about. The declaratory judgment was only that the claim is not barred by collateral estoppel. We're just saying that this was a California court decided that RTG was the owner, and we're just asking the right to enforce our ownership interest. And so you can't ignore the language that's not an adjudication of ownership, the turnover language. It happened earlier in the case when there was an identical asset, a legal claim that Segundo held against a person named Monson. That was in order to be Ms. Katona's. It was seized by a receiver. It was sold, and those assets, the proceeds, were applied toward the money judgment. That's how this would, that's what should have happened, is at worst, it should have been turned over and sold and applied toward her money judgment, which is precisely why I'm saying the remedy at worst is to restore her to the position she would have been in, i.e., she would have received credit toward her judgment against Segundo. The court asked about whether Jackson was a creative artist. Just so we're clear, Mr. Jackson doesn't have anything to do with the Ohio Players. He's not a creative artist. He's a former business partner of Raul Galavs. Mr. Lee's claim that an assignee takes subject to the assignor, that doesn't mean necessarily that RTG is charged with whatever knowledge that Segundo had. The cases that we've cited, the restatement of restitution and unjust enrichment says specifically that whether the buyer is a good faith purchaser is relevant. And so that's precisely why we're asking that this go to a jury, is that these are all facts that need to be developed in a jury trial. The last point I'd like to make is remember the whole point of the Segundo litigation. It was to restore Lisa to the position she would have been in had the transfer of the Ohio Players music rights not occurred. It did that. It gave her damages, and it punished Raul for it. But it punished Raul in my eye. I mean, this is very clear in saying that Raul and Segundo are not allowed to transfer claims of Segundo, period. They were to turn those over to Lisa. And that's precisely why. Which they did not do. The law of civil contempt deals with, if third parties are involved, they can be liable. I don't think you're, you know, I didn't, I never knew that somebody could be a good faith purchaser from somebody who was in contempt of court. I mean, judgment is notice to the world and all who are bound, right? His, for civil contempt, it has to deal with his mental state. Did he know, and what did he know, and would he have been charged with knowledge of 850 docket entries in a case that spanned the better part of a decade? Where his parents got divorced and have been in litigation for 10 years, you don't think he knew anything? That's why he should be given the opportunity to tell his story, and then a jury can make that determination. 10 years from now, we'll be back here again if the music is still being played. Thank you, Your Honor. And it will be played, I guess, every way except here. Well, my hope in this appeal is that if nothing else, the panel will at least be humming tunes to the Ohio Players song. I will. I'm disappointed you didn't figure out how to work it into the argument. It's been a rollercoaster.